F I L E D
CLERK OF COURT

2025 SEP 20 PM 12: 10

SUPERIOR COURT
OF GUAM

## IN THE SUPERIOR COURT OF GUAM

PEOPLE OF GUAM,           )    CRIMINAL CASE NO. **CF0314-21**

                     )

           vs.              )    **DECISION AND ORDER RE.**
                     )    **DEFENDANT'S MOTION TO**
                     )    **COMPEL BRADY/GIGLIO**
                     )    **MATERIAL AND DEFENDANT'S**
**NICHOLAS WAYNE MOORE,**     )    **EMERGENCY MOTION TO**
DOB: 04/08/1998              )    **COMPEL BRADY/GIGLIO**
                     )    **MATERIAL AND FOR**
           Defendant.    )    **APPROPRIATE REMEDIES**
                     )

### INTRODUCTION

This matter came before the Honorable Maria T. Cenzon on August 11, 2025, for a Pre-Trial Conference, during which the Court heard oral argument on Defendant Nicholas Wayne Moore's ("Moore" or the "Defendant") Motion to Compel Discovery of Brady/Giglio Material (the "Motion to Compel") and companion Emergency Motion to Compel Brady/Giglio Material From Federal Prosecution Team Members, For Continuance of Trial, and For Appropriate Sanctions or Dismissal (the "Emergency Motion")(the motions are collectively referred to herein as the *"Brady/Giglio* Motion" or the "Motion"), which were submitted on August 6 and 7, 2025, respectively.[1]

---

[1] On August 8, 2025, the People filed its Opposition to Def's Motion to Compel and its Response to Def's Emergency Motion to Compel Brady/Giglio Material from Federal Prosecution Team members, for Continuance of Trial, and for Appropriate Sanctions or Dismissal. On August 11, 2025, the Defendant filed his Reply to People's Opposition to Defendant's Motion to Compel and Defendant's Reply to People's Response to Emergency Motion.

Present at the hearing were Defendant Moore with defense counsels Attorney David J. Lujan, Attorney Michael F. Phillips, and Attorney William L. Gavras, all in-person (collectively, "Defense Counsels"). Representing the People of Guam ("the People") were Assistant Chief Prosecutor Grant A. Olan, and Assistant Attorneys General Christine S. Tenorio and Valerie A. Nuesa, also appearing in person (hereinafter referred to as the "People," the "Prosecution," "OAG" or individually, as "Olan," "Tenorio" or "Nuesa," as appropriate).

The gravamen of Defendant's Motion is that the Government has failed to provide exculpatory or impeachment material under *Brady* and its progeny, including *Giglio*. Specifically, Defendant seeks information that Troy Damian, a key witness for the People, previously served as an informant for the federal government.

The People respond that it has provided all of the information within its possession to the Defendant, thereby satisfying its Constitutional due process obligations and in compliance with the holdings and principles outlined in *Brady* and *Gigilo*. Defendant seeks an Order of the Court compelling the following:

1. Order the Prosecution to "scour" the files of the U.S. Attorney's Office, the U.S. Marshal's Office and Naval Criminal Investigation Service (NCIS) for Brady/Giglio Material. *Motion* at p. 8 (Aug. 6, 2025);

2. Order the Prosecution to report to the Court and Defendant the results of the search to include identifying the type of files it reviewed, "who participated in the search, what type of information was sought and what degree of confidence the government has that its search yielded the correct results and why the government's confidence is at the level reported." *Id.;*

3. Order compelling disclosure and, specifically, to "[d]irect the Attorney General's Office to diligently pursue and obtain the material from the U.S. Attorney's Office, with affidavits documenting efforts... ." *Emergency Motion* at p. 5 (Aug. 7, 2025);

4. Grant a continuance; *Id.* at p. 6.

5. Impose sanctions or dismissal if non-compliance persists. *Id.*

6. Other relief as appropriate. *Id.*

Upon review of the pleadings on file in this case, the applicable statutes, rules, and case law, and after considering the arguments of the parties during the oral argument of this matter, the Court now issues this Decision and Order **DENYING** Defendant's Motions.

## RELEVANT FACTS

On July 15, 2021, Moore and Troy Ryan Damian ("Damian") were each charged with Aggravated Murder (As a 1st Degree Felony), *Special Allegation*: Deadly Weapon Used in Commission of a Felony; Murder (As a 1st Degree Felony), *Special Allgation*: Deadly Weapon Used in Commission of a Felony; and Aggravated Assault (As a 2nd Degree Felony), *Special Allegation:* Deadly Weapon Used in Commission of a Felony. *Indictment* (July 15, 2021).

**I.     Damian's Charges are severed from CF0314-21 and, in exchange for his cooperation in the instant case, he pled guilty to different charges in CF0314-21-01.**

On September 2, 2022, this Court issued an order severing the trial of Defendant and Damian "for the purpose of adjudication of these charges, pursuant to 8 GCA § 65.35." *Order Severing Defendant Damian From CF314-21* (Sept. 2, 2022). The charges filed against Damian proceeded in Criminal Case No. CF0314-21-01. *Id.*

With respect to the charges against Damian in Criminal Case No. CF0314-21-01, the Court takes judicial notice of the following facts, pursuant to Guam Rules of Evidence Rule 201:

After the severance, this court held several hearings relating to the prosecution of the charges against Damian on September 26, 2022 (parties representing to the court that a resolution was being negotiated); November 29, 2022 (parties representing to the court that Damian was awaiting a formal plea agreement); and January 31, 2023 (parties informing the court that Attorney General's Office (OAG) would forward plea agreement to defense counsel that week). See, *Min. of Further Proceedings Hearings* on 9/26/22, 11/29/22 and 1/31/23. The court then issued an Order vacating further proceedings hearings and indicating that the matter would be set for trial due to the continued protracted delay by the OAG in sending the agreed written plea agreement to Damian's counsel. See *Order Vacating Further Proceedings Hearing and Setting Matter for Trial* (May 1, 2023).

Subsequently, on May 3, 2023, the People submitted to the Court a Plea Agreement and Information to resolve the case against Damian. The Information charged Damian with Hindering Apprehension (As a 3rd Degree Felony) and Disinterring a Corpse (As a Misdemeanor). *Information* (May 3, 2023). The Plea Agreement called for Damian to plead guilty to the charges in the Information and contained the following provisions requiring his testimony in other cases, specifically:

7.      The Attorney General and Defendant agree to the following:

a.      Defendant has fully and truthfully cooperated, and will continue to cooperate, with the Government of Guam Attorney General's Office and any other government entity lawfully authorized to conduct any inquiry, investigation or proceeding related to the offenses to which Defendant is pleading guilty;

b.      Defendant agrees to testify truthfully at any court proceeding, including grand jury, trial or any other hearing to which he is called to testify, specifically concerning his own case or those involving his co-actor, **Nicholas Wayne Moore**;

c.      Defendant agrees to submit to polygraph analysis at any and all times which the Attorney General's Office may desire to so test him. Defendant understands that the purpose of such testing will be to verify the information he provides and that results contradicting his statements may be taken as evidence by the Attorney General of falsehood on his part. Defendant will be allowed to consult with his counsel at anytime he desires;

d.      Defendant agrees that this cooperation with the Attorney General will begin immediately following his plea(s) of guilty;

e.      The Attorney General agrees that if the Court accepts this Plea Agreement and sentences Defendant in accordance with the provisions contained herein, and after Defendant has cooperated fully in the prosecution of the case against his co-actor, **Nicholas Wayne Moore**, the Attorney General will not prosecute Defendant for other crimes arising from the facts described in Guam Police Department Report No. 20-25884/20-27259, Aggravated Murder charges and will move to dismiss the charges of Fourth, Fifth, and Sixth Charges, with their accompanying special allegations, contained in the indictment in this case, Superior Court Criminal Case No. CF0314-21;

f.      Defendant voluntarily agrees to waive his rights under 8 GCA § 120.14 and to move the Court to continue his sentencing hearing until such date that the Attorney General's Office shall either move for sentencing or certify that cases against Defendant's co-actor, Nicholas Wayne Moore, has been disposed of, either in Superior Court or another forum. If Defendant fails to comply with the agreement or departs from Guam the Attorney General may move for a sentencing hearing to occur within ten (10) days thereafter, and

g.      Defendant understands and agrees that if he does not cooperate fully with the Attorney General as detailed herein, that the Attorney General may later charge and prosecute him for any crimes he may have committed.

On July 5, 2023, this Court held a Change of Plea hearing in CF0314-21-01 and accepted Damian's pleas of GUILTY to the offenses of Hindering Apprehension (As a Third Degree Felony) and Disinterring a Corpse (As a Misdemeanor). *Hrg. on 7/5/23* at 10:08:06 AM to 10:16:16 AM (July 5, 2023). The Court has not yet sentenced Damian, and he continues to await sentencing until the People are satisfied with his cooperation in this instant case. *Id.* at 10:16:16 AM. Thus, while the Plea Agreement was accepted by the court on July 5, 2023, it is not a final

adjudication of the crimes to which he plead guilty until after the People have informed the Court that it is satisfied with Damian's cooperation following trial in the instant matter.

The People have disclosed Damian's Plea Agreement in CF0314-21-01 to the Defendant and confirmed that Damian is cooperating with the Guam Police Department (GPD) and the OAG in the instant case, CF0314-21. *People's Response to Def's Emergency Mot. to Compel Brady/Giglio Material* at pp. 2, 5 (Aug. 8, 2025); *People's Opp. to Def's Mot. to Compel Discovery of Brady/Giglio Material* at p. 2, 4 (Aug. 8, 2025). As such, Defendant is aware of the cooperation agreement between Damian and the People requiring him to testify in the instant case, ostensibly in exchange for a guilty plea to lesser charges. Both the Plea Agreement and the Information in CF0314-21-01 are part of the record in that case and accessible to the Defendant.

## II. Defendant seeks information from the People regarding any cooperation or deal between Damian and the *federal* government.

Although the People have provided the Defendant with information regarding Damian's cooperation agreement with the local government in this case, the Defendant seeks an order of this Court to compel the People to "scour the files" of *federal* agencies, entities, and persons that "participated in both the investigation and prosecution of the Defendant." *Motion to Compel* at 2. This file scrubbing extends to the United States Marshal Service (the "US Marshals"), the United States Attorney's Office ("USAO"), Navy Criminal Investigative Service ("NCIS"), and "task force officers [who] participated in both the investigation and prosecution of the Defendant." *Id.*[2] The genesis of the Motion appears to be information received by Defense Counsels that Damian "has *previously worked* as a cooperating witness/informant for the federal government and this fact constituted *Brady* material which must be disclosed." *Id.* (Emphasis added). On July 14,

_____

[2] Seeking information from law enforcement officers from local and federal agencies who "are a combined force …ultimately controlled [by] the federal [government]." *Id.*

2025, Defendant, through counsels, confronted the People with this information and, it appears after some discussion, purportedly, on August 4, 2025, the People disavowed any obligation to provide this information to Defendant. *Id.*

In addition to claiming that this information is discoverable under *Brady*, Defendant argues that this information is favorable to his defense as impeachment evidence and, therefore, failure of the People to disclose it is a violation of his due process rights. *Id.* at 3 (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)). On August 8, 2025, the People submitted under seal Supporting Exhibits for People's Opposition to Defendant's Motion to Compel Discovery Brady/Giglio (the "Submission").[3] Attached as Exhibit 2 of the Submission is an e-mail exchange between AAG Olan and Carmela S. Rapadas, Law Enforcement Coordinator, USAO, which states:[4]

> Hafa Adai Attorney Olan,
>
> With regards to your telephonic inquiry to our office regarding Troy Ryan Damian, the United States Attorney's Office does not confirm nor deny the identity of any person who provides assistance to federal investigators in advance of federal proceedings requiring such disclosure.
>
> Regards,
> Carmela

Exhibit 2 also contains a response from representatives of the USAO, including Assistant United States Attorney (AUSA) Rosetta San Nicolas indicating that inquiry has been made to other federal agencies including the Federal Bureau of Investigation (FBI), the Bureau of Alcohol, Tobacco and Firearms (ATF) and various federal agencies. Exhibit 2. As of the issuance of this

---

[3] On the same day, the AGO filed an identical packet in support of its Opposition to the Defendant's Emergency Motion to Compel Brady/Giglio Material From Federal Prosecution Team Members, for Continuance of Trial, and For Appropriate Sanctions or Dismissal. The information and exhibits are collectively referred to herein as the "Submissions".

[4] Exhibit 2 to Submission: E-mail between Grant Olan and Carmela Rapadas dated August 6, 2025.

Decision and Order, the Court is unaware if additional response was received by the People from the federal government pursuant to the People's August 5 and 6, 2025, email requests and/or whether any such information was provided to Defendant.

## DISCUSSION

**I.      Timeliness of Motion To Compel.**

Despite that the Defendant's Motions were filed beyond the cut-off date set forth in the Court's Trial Scheduling Order of June 23, 2025, because the Defendant received the information regarding potential impeachment material of a material witness prior to trial, the Court has granted leave for the Defendant to file the Motions (despite no formal request to do so), in the interests of justice. Additionally, the question of whether evidence is in the possession and control of the Office of the Attorney General of Guam (OAG) in the context of where a federal agency is involved in the investigation and prosecution of a criminal case is a question of first impression in Guam and, thus, merits some careful consideration.[5]

**II.      Prosecution's Obligation under Section 70.10, *Brady* and *Giglio*.**

It is axiomatic that a defendant in a criminal case has no constitutional right to discovery. *People v. Orallo*, 2004 Guam 5 (quoting *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846 (1977)). Rather, "'the right to pre-trial discovery is strictly limited to that which is permitted by statute or court rule mandated by constitutional guarantees.'" *Id.* ¶ 9 (quoting *Cole v. State*, 835 A.2d 600, 608 (Md.2003) (quoting *Tharp v. State*, 763 A.2d 151, 171 (Md.2000)).

Statutorily, Title 8, Guam Code Annotated, Chapter 70 governs discovery obligations and, as relevant to the question at bar, provides as follows:

//

---

[5] The Court subsequently, but after the hearing of this matter, extended the motions cut-off date to August 29, 2025.

## § 70.10. Matters Generally Discoverable; Prosecutors' Obligations.

(a) Except as otherwise provided by §§ 70.20 and 70.30, at any time after the first appearance upon noticed motion by the defendant, the court shall order the prosecuting attorney to disclose to the defendant's attorney or permit the defendant's attorney to inspect and copy the following material and information within his possession or control, the existence of which is known, or by the exercise of due diligence may become known to the prosecuting attorney:

> (7) any material or information which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce his punishment therefor. * * *

(b) The prosecuting attorney's obligations under this Section extend to any material information in the possession or control of members of his staff and any other persons who have participated in the investigation or evaluation of the case and who either regularly report or with reference to this case have reported to his office.

## § 70.15. Other Matters Discoverable Upon Good Cause Showing.

(a) Except as otherwise provided by this Section and §§ 70.20 and 70.30, upon noticed motion by the defendant and a showing of materiality to the preparation of his defense and that the request is reasonable, the court in its discretion may order the prosecuting attorney to disclose to the defendant's attorney any relevant material and information not covered by § 70.10.

(b) The court may deny the disclosure authorized by this Section if it finds that there is substantial risk to any person of physical harm, intimidation, bribery, economic reprisals or unnecessary annoyance or embarrassment, resulting from such disclosure, which outweighs any usefulness of the disclosure to the defense.

The statutory obligations set forth in these Guam statutes codify principles set forth by the United States Supreme Court in *Brady v. Maryland,* 373 U.S. 83 (1963), which articulated the standard rule that suppression of evidence favorable to the accused violates due process when the evidence is material to guilt or punishment, regardless of the prosecution's good or bad faith in failing to produce such evidence. *People v. Mateo,* 2017 Guam 22 ¶ 14 (citing *Orallo* at ¶ 12). *Giglio v. United States,* 405 U.S. 150 (1972), extended this principle to include impeachment

evidence, emphasizing that nondisclosure of evidence affecting the credibility of a key witness can violate due process if the evidence is material and could reasonably affect the judgment of the jury. The Guam Supreme Court has ruled that *Brady* material, and by extension *Giglio* material, must be produced to a defendant under Section 70.10.[6] These cases establish, *as a general rule*, that the prosecution must disclose *material evidence* within its possession or control that is favorable to the defense.

However, upon a claim that the prosecution has committed a *Brady* violation, a defendant must prove three elements in order to demonstrate that a violation has occurred: (1) the evidence at issue must be favorable to the defendant because it is either exculpatory or impeaching, (2) the government must have suppressed the evidence, either willfully or inadvertently, and (3) the suppression of the evidence must have prejudiced the defendant in that it deprived him or her of a fair trial. *Mateo* at ¶ 13 (quoting *People v. Campos*, 2015 Guam 11 ¶ 29 (citing *People v. Kitano*, 2011 Guam 11 ¶ 21)(affirming trial court's finding that no *Brady* violation occurred because the prosecution did not suppress documents relating to the photo lineup used to identify the defendant)). Before even applying the elements in *Brady, Mateo* imposes upon the criminal Defendant a *threshold showing of materiality* before the prosecution is obligated to turn over any evidence under Section 70.10. *Id.* at ¶ 15 ("…under both sections 70.10 and 70.15, as well as our holding in *Tuncap*, [1998 Guam 13 ¶ 18], a threshold showing of materiality must be established before the prosecution is obligated to turn over evidence to the defendant either automatically (under section 70.10 and *Brady*) or following a motion by the defendant (under section 70.15)."). "A showing of materiality, however, is not satisfied by a mere conclusory allegation that the

---

[6] *People v. Madeus*, 2019 Guam 24 ¶ 7 (citing *People v. Orallo*, 2004 Guam 5 ¶ 12; *People v. Fisher*, 2001 Guam 2 ¶ 12; *People v. Mateo*, 2017 Guam 22 ¶ 13).

requested information is material to the preparation of the defense." *United States v. Farah*, No. 22-CR-124 (NEB/TNL), 2023 WL 8757097, at *9 (D. Minn. Dec. 19, 2023) (quoting *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985)).

The focused issues before the Court are: (1) is information about a material witness's participation as an informant for the federal government in an unrelated case *material*, thus satisfying the threshold question under *Mateo,* and (2) if it is material, whether the local government is "in possession" of the federal government's information under 8 GCA § 70.10(b).[7]

A.    **Defendant seeks information about witness Troy Damian purportedly in the possession of the federal government on the basis that the information is impeachment evidence and the People have constructive possession of this information.**

On July 14, 2025, Defense Counsel informed the government that Troy Damian, "a critical witness for the government, has previously worked as a cooperating witness/informant for the federal government." *Motion to Compel* at p. 2 (Aug. 6, 2025). Defendant argues that this information is favorable to his defense as impeachment evidence and, therefore, failure of the People to disclose it is a violation of his due process rights. *Id.* at 3 (citing *Giglio v. United States,* 405 U.S. 150, 154-55 (1972)). In later submissions, Defendant further seeks to expand the disclosure to include such information "to *all potential witnesses and evidence* since we now know the U.S. Attorney's Office explicitly refuses to share *Brady/Giglio* material." *Def's Reply to People's Response to Def's Emergency Motion to Compel Brady/Giglio Material* at p. 3 (emphasis added).

In undertaking this analysis, the Court considers first whether Defendant has satisfied the threshold question under *Mateo, supra,* of establishing that information that Damian is a federal

---

[7] The third *Brady* factor – "the suppression of the evidence must have prejudiced the defendant in that it deprived him or her of a fair trial" – is premature at this stage of the proceedings.

informant or cooperating witness is *material,* in the context of *Brady* or *Giglio.* If the Court finds that this information is material, the Court next considers whether the government has the duty to provide this information – which is in the possession of the federal government – as to "all potential witnesses and evidence," as maintained by Defendant.

**1.      Information that Damian is or previously was a *federal* informant or cooperating witness for the *federal* government in an unrelated case is not *Brady* material.**

There is no disagreement that information regarding a cooperation agreement between Damian and the People *in the instant case* (or, more accurately, in the severed case) is relevant as potential impeachment evidence under *Brady/Giglio.*[8] The People reported that the cooperation agreement between Damian and the OAG/GPD has been disclosed to the Defendant. As such, Defendant has been given impeachment material which is *directly* related to this case. The question before this Court is whether Damian's cooperation with the federal government in an unrelated case is *Brady* or *Giglio* material, subject to disclosure.

Despite a number of citations contained in Defendant's Motions, Defendant has not provided the Court with any controlling or persuasive case authority supporting its argument that any prior (or current) cooperation agreement between Damian *and the federal government* or information whether he has served in a prior role as a *federal informant* in unrelated cases is subject to disclosure in this case as *Brady* material. The Guam Supreme Court has not addressed this specific issue; therefore, this Court turns to cases from other jurisdictions that address this

---

[8] *People v. Fisher,* 2001 Guam 2, ¶ 12 (citing *Giglio v. United States,* 405 U.S. 150, 151-155) (1992)(holding that evidence relating to the credibility of government witnesses, including but not limited to plea agreements, financial assistance, inducements to testify, and promises of leniency fall within the due process requirements of *Brady*).

question and finds persuasive those holding that a prosecution witness's previous cooperation agreement, which bears no relation to the case in which the witness testified, is *not Brady* material.

In a case similar to the one at bar, *People v. Sibadan,* 240 A.D.2d 30, 671 N.Y.S. 2d 1 (N.Y. App. 1 1998), the court therein held that a prosecution witness's prior history of cooperation with the prosecutor's office did not establish any agreement or understanding that witness would receive benefits for information he provided at trial as required under *Brady* because the witness's prior cooperation had involved matters unrelated to his agreement to testify in the case and also pre-dated the case in which he was called to testify. The prosecution in *Sibadan* had already fully disclosed the terms of a cooperation agreement between the witness and the District Attorney's Office relating to his testimony in the case in which he was called to testify, permitting the witness to plead guilty to a lesser charge with recommendation by the People of a low term of incarceration. Moreover, the court therein ruled that even if the witness had cooperated in the past with the investigative agency, such information would not be *Brady* material:

> Generally, the prosecutor's disclosure obligation arises only where "the prosecutor and the witness have reached an understanding in which the witness's cooperation has been exchanged for some *quid pro quo* on the part of the prosecutor" (*People v. Novoa, supra* at 497, 522 N.Y.S.2d 504, 517 N.E.2d 219), or where there is any other indication that the witness' cooperation "was bargained for, directly or indirectly" (*People v. Piazza, supra* at 163, 422 N.Y.S.2d 9, 397 N.E.2d 700; People v. Matos, *supra* at 278, 634 N.Y.S.2d 461).

*Sibadan,* 240 A.D.2d at 34. Although *Sibadan* involved the witness's prior cooperation in unrelated investigations involving the local government (as the witness had refused to cooperate with the federal Drug Enforcement Agency ("DEA")), the principle holds that unless a *quid pro quo* exchange occurred with regard to the witness's involvement in the case, such involvement is not *Brady* material.

In *People v. Tellier,* 272 A.D. 2d 347, 707 N.Y.S. 2d 469 (N.Y. App. Div. 2 2000), a case which even more closely mirrors the instant case, the trial court concluded that the state prosecutor failed to disclose that a witness in the trial was cooperating with the federal government in an investigation involving the defendant and vacated the defendant's conviction after finding, *inter alia,* that the witness had implicitly entered into a *quid pro quo* agreement with federal authorities. *Id.* at 348. On review, however, the appellate court reversed the trial court's decision after finding that any cooperation agreement between the witness and the federal government did not occur until after the trial of the defendant. *Id.* More importantly, the agreement between the witness and the federal government did not involve the charges for which the defendant was on trial (which were state charges), but potentially for separate federal racketeering charges. *Id.* In the agreement with the federal government, which was entered into after the state trial of the defendant, the witness would testify against the defendant in the federal criminal racketeering action in exchange for allowing him to plead to a lesser federal conspiracy charge and a recommendation to the Federal sentencing judge for a more favorable sentence. *Id.* There was no evidence that the federal government agreed to provide the witness with a favorable plea agreement and lenient sentence in exchange for his testimony *in the unrelated state trial. Id.* at 349.

Similarly, in this case, nothing in Defendant's moving papers establishes or infers that, even if Damian previously served as an informant for the federal government, that such engagement is tied to a benefit in exchange for his testimony in *this* case. As such, the Court finds that any information that Damian is or was a federal informant is *not* subject to disclosure under *Brady* or *Giglio.*[9]

---

[9] See also, *Commonwealth v. Ayala,* 481 Mass. 46, 112 N.E.3d 239 (2018), discussed, *infra.*

Even if the Court were to find, arguendo, that any prior cooperation agreement between Damian and the federal government (regardless of its relation, or lack thereof, to this case) is *Brady* material – which it is not – the Court finds that it is information not in the possession – constructive or otherwise – of the People. Therefore, the government's failure to disclose the information to Defendant is not a violation of *Brady* or *Giglio*.

**2.     Whether a federal agency's knowledge and possession of potential impeachment evidence is imputed upon the Office of the Attorney General depends upon extent of the federal agency's involvement in the local investigation.**

8 GCA § 70.10 imposes upon prosecutors an affirmative duty to disclose to the defendant's attorney any evidence which is favorable to the defense known to it, or by the exercise of due diligence may become known to the prosecuting attorney, and which is in his possession or control. This duty extends "to any material information in the possession or control of members of his staff and any other persons who have participated in the investigation or evaluation of the case and who either regularly report or with reference to this case have reported to his office." 8 GCA § 70.10(b).

Guam courts have not addressed the issue of whether this mandate extends to impute upon a local prosecutor potentially exculpatory or impeachment information in the hands of federal agencies that have assisted or in any way participated in the local investigation or evaluation of the case, or who have reported to the prosecutor with reference to his office under Section 70.10. Even more specifically, the Guam Supreme Court has not considered the very narrow question of whether a defendant is entitled under Section 70.10, *Brady,* or its progeny, to information in the hands of the federal government that a material witness for the prosecution is a federal informant or a cooperating witness for the federal government in an unrelated case. See, *Kyles v. Whitley,* 514 U.S. 419, 437 (1995).

Thus, the Court examines the following: what constitutes a "joint investigation" between state or territorial and federal agencies in a criminal investigation for purposes of imputing a federal agency's knowledge to a state prosecutor under *Brady*? Because the Guam Supreme Court has not had the opportunity to address this specific issue, the Court turns to case law from other jurisdictions for guidance.

Courts in other jurisdictions have similarly grappled with the boundaries of constructive knowledge, especially in contexts where federal entities participate in, but do not direct, local investigations. The extent of collaboration, control, and access to evidence are pivotal factors in determining whether knowledge possessed by federal agencies should be imputed to the local prosecuting authority. Thus, the inquiry before the Court requires an examination of the practical and legal relationships among the agencies involved.

In evaluating whether such knowledge is imputed, courts in other jurisdictions have considered whether the federal agency acted as part of the prosecution "team" or merely provided ancillary support. While active participation or a joint investigative effort can trigger broader disclosure obligations, mere tangential assistance — such as technical support or forensic analysis — may not suffice to attribute full constructive knowledge to local prosecutors. Consequently, the underlying question hinges on the degree to which federal agencies shared personnel, resources, or investigative strategy with the Office of the Attorney General of Guam.

The Defendant correctly cites to *United States v. Antone,* 603 F.2d, 566 (5th Cir. 1979), for the proposition that to determine whether a joint investigation has occurred, courts engage in a case-by-case analysis of the extent of interaction and cooperation between the two governmental

agencies. *Id.* at 570.[10] A primary factor is the nature of cooperation, such as coordinating witness interviews and investigating the facts of the case.[11] Other factors include whether the other agency: "(1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings."[12]

Furthermore, the case law on the subject is varied as to the outcomes, which suggests that the involvement of federal agencies, in and of itself, does not automatically establish constructive possession and the duty to disclose; rather, they depend upon an evaluation of agency roles, responsibilities, and the nature of their participation in the investigation and prosecution.

In *United States v. Risha*, the Third Circuit outlined a three-factor test to determine whether cross-jurisdictional constructive knowledge should be imposed: (1) whether the party with knowledge is acting on the government's behalf or under its control; (2) the extent to which the entities are part of a team, participating in a joint investigation, or sharing resources; and (3)

---

[10] See also, *United States v. Farah*, No. 22-CR-124 (NEB/TNL), 2023 WL 8757097, at *10 (D. Minn. Dec. 19, 2023)("Whether the prosecution has a duty to conduct a *Brady* review of materials in the possession of another government agency depends on a fact-intensive inquiry into the extent to which the agencies conducted a joint investigation.")(court finding no "joint investigation" under the circumstances)(citing *United States v. Gilbertson*, No. 17-cr-0066(1) (PJS/HB), 2018 WL 1905805, at *2 (D. Minn. Apr. 23, 2018); accord *Tavlin*, 2023 WL 3477610, at *3; see, e.g., *United States v. Middendorf*, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D. N.Y. Aug. 17, 2018); *United States v. Connolly*, No. 1:16-cr-00370 (CM), 2017 WL 945934, at *6, *7 (S.D. N.Y. Mar. 2, 2017); *United States v. Gupta*, 848 F. Supp. 2d 491, 493 (S.D. N.Y. 2012); see also, e.g., *United States v. Tournant*, No. 22-CR-276-LTS, 2023 WL 5001186, at *3 (S.D. N.Y. Aug. 4, 2023); *United States v. Alexandre*, No. 22 Cr. 326 (JPC), 2023 WL 416405, at *5 (S.D. N.Y. Jan. 26, 2023); *United States v. Avenatti*, No. 19-CR-374 (JMF), 2022 WL 457315, at *10 (S.D. N.Y. Feb. 15, 2022); *United States v. Bourassa*, No. 4:18-cr-3-MLB, 2020 WL 7778038, at *2 (N.D. Ga. Dec. 31, 2020); *United States v. Tyson*, No. 1:18CR708, 2020 WL 255533, at *1 (N.D. Ohio Jan. 16, 2020); *United States v. Ferguson*, 478 F. Supp. 2d 220, 238 (D. Conn. 2007); cf. *United States v. Risha*, 445 F.3d 298, 301-02 (3d Cir. 2006); *United States v. Antone*, 603 F.2d 566, 570 (5th Cir. 1979); *United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D. N.Y. 2018).

[11] *United States v. Tavlin*, No. 22-CR-134 (DWF/JFD), 2023 WL 3477610 (D. Minn. May 16, 2023), aff'd, No. CR 22-134 (DWF/JFD), 2023 WL 4669558 (D. Minn. July 20, 2023).

[12] *Tavlin*, No. 22-CR-134 (DWF/JFD), 2023 WL 3477610 at *3 (quoting *United States v. Middendorf*, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018)).

whether the entity charged with constructive possession has ready access to the evidence. *United States v. Risha*, 445 F.3d 298, 304 (3d Cir. 2006). See also, *United States v. Denunzio*, 123 F.Supp.3d 135 (2015).

Examples of a "joint investigation" include: where the US Attorney's Office and the Securities and Exchange Commission jointly interview forty-four witnesses, the USAO is required to review SEC's memoranda relating to those interviews for Brady material (*United States v. Gupta*, 848 F.Supp. 2d 491, 493 (S.D.N.Y. 2012)); where USAO and SEC jointly conducted and coordinated twenty interviews of twelve witnesses and SEC provided USAO with documents obtained during its own investigation the agencies were deemed to be conducting a "joint" rather than parallel investigation. *United States v. Martoma*, 990 F.Supp. 2d 458 (S.D.N.Y. 2014).

In contrast, where there is no joint investigation or *significant* cooperation, courts have declined to impute knowledge of the federal agency upon the state prosecutor. In *People v. Santorelli*, 95 N.Y.2d 412 (2000), central to the Court's review in that case is the question of whether FBI interview reports pertaining to a federal investigation were wrongfully withheld from the defendant in a state prosecution. The extent of the federal agency's involvement in *Santorelli* was much more significant in that case than in the instant matter: in *Santorelli*, the FBI saw the defendant discard clothing which turned out to be evidence of a murder committed by another individual. Santorelli was charged with tampering with physical evidence. Defense requested all *Brady* material and requested "a copy of all FBI 302 reports and notes reflecting debriefings of Nicholas Mazzarella concerning persons and incidents related to this case." Mazzarella was present when other individuals admitted to killing someone.

In that case, the defendant urged that the People must be charged with the FBI's refusal to disclose the requested material; however, the court held that the federal government had no duty to disclose information possessed by a separate sovereign conducting its own independent investigation. Therefore, the state prosecutor did not commit a *Brady* violation by failing to produce any FBI reports requested by defense counsel that were not in the control of the state prosecutor.

In this regard, the court reasoned:

> Here, defendant does not question that the People produced all *Brady* material in their actual possession. Undisputedly, the People did not possess the additional reports defendant seeks. The reports—involving a separate, pre-existing investigation—were in the hands of the FBI, an independent Federal law enforcement agency not subject to State control. While defendant argued that the two agencies were engaged in a joint or cooperative investigation, and that the District Attorney thus had constructive possession or control of the Federal records, the trial court held otherwise, and the record before us supports that undisturbed finding (contrast, *United States v. Antone*, 603 F.2d 566, 569–570 [knowledge of State officers could be imputed to Federal prosecutor where there was " extensive cooperation between the investigative agencies" and "entire effort was marked by (a) spirit of cooperation"]). Indeed, the record reflects that there were no undisclosed 302 reports concerning the February 4, 1994 events, and that Federal reports concerning the FBI's "parallel" but separate investigation were unavailable to either side in this case.

> Further establishing the District Attorney's lack of access to the FBI reports is the record of unsuccessful attempts to obtain them from Federal authorities. On at least two occasions the District Attorney asked the United States Attorney's Office and the FBI for the reports, and both times was refused on the ground that the FBI considered the materials to be unrelated to the State's investigation. There is no record support for defendant's conclusory assertion of the People's bad faith or the existence of a government conspiracy to deprive defendant of information. ***That a Federal law enforcement agent served as a fact witness at defendant's trial does not alter the conclusion that the People did not possess or control—actually or constructively—the additional materials defendant sought.***

*People v. Santorelli*, 95 N.Y.2d 412, 421–22, 741 N.E.2d 493, 497–98 (2000)(emphasis added).

In *Commonwealth v. Ayala*, 481 Mass. 46, 112 N.E.3d 239 (2018), shortly before the defendant's trial for first-degree murder, the prosecution informed defense counsel that it had

recently learned that the sole *defense* witness was a confidential informant for a federal gang task force. *Id.* at 247. The trial was continued, and, during the period of the continuance, the defendant filed several motions in state court proceedings to obtain Federal records detailing the witness's status as a confidential informant and to compel several Federal agents to testify about this witness's status. *Id.* In these motions, defendant argued that the information about the witness's informant status was material to his defense because it was necessary to determine her credibility as a witness. *Id.* The opinion describes the process that the defendant would have to undertake in order to obtain the material from the federal agency in question as follows:

> At various times, the defendant was informed that a successful pursuit of this information would require that he comply with the procedure set forth by Federal regulations. The federally mandated procedure required the defendant to submit a written request for information describing the informant records and the subject matter of the testimony sought. Federal authorities would then review the sought-after information for privilege, confidentiality, and the likelihood that its disclosure would compromise ongoing investigations. After this review, the Federal authorities would report back to the defendant and either disclose the requested information or explain why it was continuing to be withheld.

*Id.* Despite being made aware of the federal procedure, the defendant in *Ayala* refused to comply and continued to unsuccessfully request that the trial court judge compel federal authorities to disclose this information. *Id.* The defendant claimed that his due process rights under the Fifth and Sixth Amendments were violated by the state's failure to obtain and turn over discovery related to the sole defense witness's status as a confidential informant for the federal government; however, the court in *Ayala* disagreed. Applying a four (4) factor analysis, the court ruled: (1) No unfairness resulted to defendant as a result of not receiving information that the witness was a federal informant; (2) Defendant's failure to avail of the process under the federal regulations in order to obtain informant records despite advance knowledge of the witness's status as an informant and knowledge of the federal procedure by which he could have obtained the

information weighed against Defendant; (3) the burden on the prosecutor in obtaining the information weighed against Defendant because the information held by federal authorities was *not* in the possession of the prosecutor as the prosecutor would have been required to comply with the federal procedure as well; and (4) based upon a review of the degree of cooperation in the case between the state and federal agencies, despite that several state police officers were deputized as federal officers for the purpose of operating within a federal gang task force, the court found that there was no joint investigation.

Applying the factors in *Ayala* to this case, the Court considers:[13]

**(1) Defendant's failure to avail of the process under the federal regulations:**[14] Despite arguing that the information about Damian's status as a federal informant is within the People's possession, it was the Defendant, through his counsel, who identified at least one federal investigation or case in which Damian purportedly provided information to the federal authorities. Therefore, this information was already in the possession of the Defendant. Moreover, it was defense counsel who directed the Court and the prosecution to the Justice Department regulations applicable to obtaining the information from the federal government; yet, there is no indication that the defendant has diligently pursued this avenue, despite it being available to him.

**(2) The burden on the prosecutor in obtaining the information:** In *Ayala*, the court considered whether the prosecutor "has a means of access to the information held by Federal authorities that the defendant does not. [Citation omitted.] Here, the prosecutor would have been

---

[13] One significant difficulty in ruling on Defendant's *Brady* request is that a determinative factor as to whether "suppressed" evidence is "material" is "whether there is a reasonable probability that, had the evidence been disclosed to the defense, *the result of the proceeding would have been different.*" United States v. Blaszczak, 308 F. Supp. 3d 736, 740 (S.D.N.Y. 2018)(quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)(quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985))(emphasis added). Obviously, as the Defendant has yet to be tried in this matter, it is impossible to determine prejudice to the Defendant in this context.

[14] See, *Ayala* at p. 251.

required to comply with the Federal procedure as well." *Id.* at 250. "In response to discovery requests issued by the defendant that sought to determine whether other individuals at the party were also Federal informants, the prosecutor submitted requests for information related to these individuals in compliance with the Federal regulations. Rather than disclose this information, the FBI curtly informed the prosecutor that it "decline[d] either to confirm or deny whether [an individual] is or was an informant for the FBI." *Id.* In this case, in response to a *Toughy* letter, the USAO's response to AAG Grant Olan was virtually identical: "the United States Attorney's Office does not confirm nor deny the identity of any person who provides assistance to federal investigators in advance of federal proceedings requiring such disclosure." *Exhibit 2.*

**(3) Based upon the degree of participation between Guam and federal authorities, there was no "joint investigation":** Although the Court will discuss this factor in greater detail below, applying this factor, the Court finds that of the hundreds of potential witnesses identified by both the prosecution and the defense, only one witness – Eric Salone – was interviewed by NCIS because he was a United States sailor at the time of his interview by NCIS and was the subject of an investigation by NCIS for a separate case. The defendant was not the subject of the NCIS interview.[15] *See, United States v. Blaszczak,* 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018).

In *United States v. Blaszczak,* the district court held that the Securities and Exchange Commission ("SEC") did not act as an "arm of the prosecutor" despite having initiated an investigation against the defendant in that case for insider trading. In that case, despite the SEC having conducted simultaneous interviews together with the United States Attorney's Office ("USAO") of various witnesses, the court held that the USAO was not required to review the

---

[15] People's Response to Def's Emergency Mot. to Compel Brady/Giglio Material at 3.

SEC's action memorandum (upon which was based the SEC's separate civil enforcement action against defendant) for any *Brady* material, reasoning as follows:

> [T]he Brady doctrine is directed, first and foremost, at suppression of evidence by prosecutors although, to be sure, it is not—and could not properly be—so rigorously cabined. It extends to anyone who is an "arm of the prosecutor." [citation omitted].
>
> Many cases deal with whether particular individuals have acted as "arms of the prosecutor" in given cases. Thus, for example, a government agent who "participated actively in [an] investigation," "was present at counsel's table throughout all or most of the trial," and "indicat[ed] that he was intimately involved in the prosecution" was held to have acted as an arm of the prosecutor. [citation omitted]. But a parole officer did not. [citation omitted]. Nor did a cooperating witness or informant who provided information and testified at trial, but who "played no role in the investigation or in determining investigation or trial strategy." [citation omitted]. Even a government expert who assisted prosecutors in developing cross-examination questions and participated in mock cross examinations was held not to have acted as an "arm of the prosecutor" [citation omitted]... .

*United States v. Blaszczak,* 308 F. Supp. 3d 736, 741 (S.D.N.Y. 2018). See also, *Diallo v. State,* 413 Md. 678 (2010)(the court found that the state prosecutor did not have constructive possession of federal records because the federal investigation was parallel but separate, and there was no extensive cooperation between the agencies).

In this case, the Court considers the extent of the federal agency's involvement in the investigation leading to the charges against the Defendant here. Defendant proffers that the USAO filing its Complaint against Defendant for Unlawful Flight To Avoid Prosecution Under 18 U.S.C. § 1073 supports a finding of a single prosecutorial team and, thus, the People must further "scour" the records of the USAO, the FBI and other federal agencys for *Brady* material. The Court disagrees.

//

//

### a. The 18 USC Section 1073 Action Filed by the USAO in Federal District Court does not create a "joint investigation" between the USAO and the local law enforcement.

Defendant argues that the filing of a criminal action by the USAO in the District Court of Guam under 18 USC § 1073 (also known as the "Fugitive Felony Act" or "FFA") supports a finding that the federal government is part of the local prosecution team and, therefore, the People are held to be in constructive possession of *Brady* or *Giglio* material in the hands of the USAO, NCIS, the FBI, the U.S. Marshal Service and any other federal agencies who were involved in this case. In this regard, Defendant claims:

> The criminal complaint [in the federal court] underscores a shared investigative and informational nexus between Guam authorities and federal agencies: the factual core of the federal charge (flight to avoid prosecution) depends entirely on actions and evidence developed in Guam criminal investigations and communicated to or relied on by federal authorities in preparing the affidavit. The criminal complaint was not the initiation of a stand-alone prosecution, but rather it was a procedural mechanism permitting the federal government to work with and to assist a Guam local investigation that resulted in the instant prosecution.

> The facts show that the U.S. Attorney's Office charged Moore federally based directly on Guam Police Department investigations, and the U.S. Marshals worked closely with Guam authorities, using their information to locate and apprehend Moore in Florida. The intertwined nature of the investigations, shared factual predicate, and coordinated action support the view that (for Brady material purposes) federal prosecutors were functionally and practically part of the "prosecution team" with Guam authorities.[16]

Defendant correctly notes that the USAO filed a Criminal Complaint against him for a violation of the FFA when he departed Guam in violation of the Act. *Def's Motion to Compel* at Exhibit A – Complaint in Federal Court (*United States of America vs. Nicholas Wayne Moore, United States District Court for the Territory of Guam, Magistrate Case No. 21-00128 (May 28, 2021)*). As further support for the finding of a joint investigation or team effort, Defendant points

---

[16] *Motion to Compel* at p. 4.

to the USAO's Application to Seal the Record, and subsequently, Unseal the Record in the same case. *Id.* at Exhibits B, C. He argues that the filing of the FFA action and the motions to seal and then unseal the record indicates the U.S. Attorney's Office had ongoing control and oversight of the investigative process; that the USAO "was not a passive or secondary participant. Instead, they made deliberate prosecutorial decisions regarding timing, secrecy, and coordination of law enforcement response, *thus showing an integrated prosecution team in Brady analysis.*"[17] The Court disagrees.

### i. Federal FFA Complaint is separate and independent of local prosecution and seeks to advance a separate federal interest.

The basis of an action under the Fugitive Felony Act (FFA) is a defendant's act of fleeing the state or territorial jurisdiction in which the defendant faces prosecution in order to avoid such prosecution. Thus, a complaint under the FFA charges the defendant with a *separate and distinct crime* from the state (or territorial) prosecution for the underlying felony alleged to have been committed by the Defendant.

18 U.S.C. § 1073 provides as follows:

**§ 1073. Flight to avoid prosecution or giving testimony.**

Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the laws of the place from which the fugitive flees, or (2) to avoid giving testimony in any criminal proceedings in such place in which the commission of an offense punishable by death or which is a felony under the laws of such place, is charged, or (3) to avoid service of, or contempt proceedings for alleged disobedience of, lawful process requiring attendance and the giving of testimony or the production of documentary evidence before an agency of a State empowered by the law of such State to conduct investigations of alleged criminal activities, shall be fined under this title or imprisoned not more than five years, or both. For the purposes of clause (3) of this

---

[17] *Id.* at p. 7 (emphasis added).

paragraph, the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

***Violations of this section may be prosecuted only in the Federal judicial district in which the original crime was alleged to have been committed***, or in which the person was held in custody or confinement, or in which an avoidance of service of process or a contempt referred to in clause (3) of the first paragraph of this section is alleged to have been committed, and only upon formal approval in writing by the Attorney General, the Deputy Attorney General, the Associate Attorney General, or an Assistant Attorney General of the United States, which function of approving prosecutions may not be delegated.[18]

The seminal case interpreting the Congressional intent of the FFA is *U.S. v. Brandenburg,* 144 F.2d 656, 659 (3rd Cir. 1944), which contains the following discussion:

> The purpose of the Fugitive Felon Act was stated by Congressman Sumners, Chairman of the Committee on the Judiciary of the House of Representatives, quoting the comments of the Attorney General of the United States on the bill as follows: 'One of the most difficult problems which local law-enforcement agencies have to deal with today is the ease with which criminals are able to flee from the State to avoid prosecution * * * . The above bill is considered the most satisfactory solution of this problem, which the States have never been able to solve effectively. This bill will not prevent the States from obtaining extradition of roving criminals, but the complicated process of extradition has proved to be very inefficient. The ability of Federal officers to follow a criminal from one State to any other State or States, as provided in the above bill, should furnish the desired relief from this class of law evaders. * * * ' Report No. 1458 of the House Committee on the Judiciary to accompany S. 2253, May 3, 1934, 73rd Congress, 2nd Session. The same report shows that the word 'burglary' and the other specific offenses named in the Act were substituted for the words 'a felony' used in the original bill. The general purpose of the Act was to assist in the enforcement of state laws.

In *U.S. v. Thurman*, the Third Circuit held that the primary purpose of the Act is to:

> [...] return the felon to the state where the original flight occurred in order to assist state officials in combatting organized crime there, and ***to vindicate the federal interest*** in punishing acts committed in the judicial district where the original flight took place. As the court observed in *Lupino v. United States*, 268 F.2d 799, 801 (8th Cir.), cert. denied, 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed.2d 75 (1959):

> > Such flights by perpetrators of crimes against the states are a common means of hindering state justice as is well known and, as it

---

[18] 18 U.S.C. § 1073(emphasis added).

> is the federal government which accords the freedom of movement throughout the country that makes the flights possible, it is plainly within the province of that government to regulate this abuse of it. The abuse is against the peace and dignity of the United States and also that of the States.

*United States v. Thurman*, 687 F.2d 11, 13 (3d Cir. 1982)(emphasis added).

Moreover, the federal complaint under the FFA may proceed even absent the filing of an indictment in the state court against the fleeing defendant. In *Lupino v. United States*, 185 F. Supp. 363, 367 (D. Minn. 1960), the Minnesota District Court, in addressing the constitutionality of the FFA, ruled that the law serves the entire nation and the national interest in the judicial system, regardless of whether the state has charged the fleeing defendant, finding that the federal prosecution is independent of any actual state prosecution of the underlying state law crime:

> Section 1073 proscribes acts which are offensive to the dignity of the United States, not the individual State. For that reason the existence or lack thereof of State charges is wholly irrelevant insofar as a citizen is accorded due process in his arrest for violating Section 1073. Congress, not the states, has established the punishable offense, and it is, therefore, federal, not state, arresting and removal process which is relevant.

In the instant case, the Indictment against Defendant had not been filed at the time the USAO filed its FFA Complaint in the District Court of Guam on May 28, 2021. See, *Def's Mot. to Compel* at Exhibit A, B; compare, *Indictment* in CF0314-21 (July 15, 2021). Thus, the action in the federal court proceeded independently of the instant case and, therefore, cannot be considered a "joint prosecution" between the USAO and the Guam Police Department and other local authorities.

Additional information contained in the Defendant's submission supports this finding, including Defendant's acknowledgement that "[t]he U.S. Marshals Service *led* the investigation regarding Moore's fugitive status after a warrant for murder and related offenses was issued by the Superior Court of Guam." *Motion to Compel* at p. 5 (emphasis added). Exhibit A to

Defendant's Motion to Compel is the Complaint in the District Court pursuant to the FFA and contains the sworn statement of Deputy U.S. Marshal Marciano J. Patricio, who is the Deputy in Charge of the U.S. Marshals Violent Fugitive Task Force, USMS, District of Guam. Exhibit A at ¶ 1. In the Complaint, Patricio avows, as follows:

> 3. The information in this affidavit is based on my personal knowledge, information provided to me by other law enforcement officers and individuals, and the reports and memoranda of other law enforcement officers. ***The information in this affidavit is provided _for_ _the_ _limited_ _purpose_ _of_ _establishing_ _sufficient_ _probable_ _cause_ _for_ _a_ _request_ _for_ _a_ _warrant_ _of_ _arrest_*** and does not set forth all of my knowledge about this matter.

> 4. On May 21, 2021, I received information through investigative means that the Defendant, NICHOLAS WAYNE MOORE (MOORE), is a fugitive/person with an outstanding warrant of arrest issued by the Superior Court of Guam for the offense of Murder, Aggravated Assault and the Use of a Deadly Weapon in the Commission of a Felony. Defendant MOORE was located on May 27, 2021, by Deputy U.S. Marshals and task force officers with the U.S. Marshals Florida Regional Fugitive Task Force. Defendant MOORE was located and positively confirmed outside his apartment unit at 4300 Bay Point Drive, Panama City Beach, Florida.

> 5. Information developed during the investigation that indicated that Defendant MOORE was implicated in two (2) separate "shooting" investigations on Guam that occurred on October 15, 2020, and October 30, 2020, wherein one victim survived the incident. The second victim was later reported missing and is presumed deceased. Throughout the investigation, it is believed that the second victim was shot multiple times with a .45 caliber pistol, while inside his vehicle. The second victim's body is also believed to be disposed of in the ocean, utilizing Defendant MOORE's father's boat. DNA testing further indicated that the blood located in the victim's vehicle and blood later found on the pistol (.45 caliber) confiscated at Defendant MOORE's Guam residence, matched the DNA of the second victim.

> 6. On November 14, 2020, just days after his interview with Guam Police Department Detectives, Defendant MOORE departed Guam with the reason of attending a drug rehabilitation program at the Betty Ford Clinic in Palm Springs, California. Defendant MOORE was scheduled to return to Guam within 30 days following the completion of his treatment. The Guam Police Department has since learned that Defendant MOORE left the state of

California and was arrested on February 9, 2021, in Panama City Beach, Florida by police officials for a misdemeanor criminal offense.

7. Based on the information in this Affidavit, your affiant submits there is probable cause to support the issuance of a criminal complaint and arrest warrant for NICHOLAS WAYNE MOORE for violation of Title 18, United States Code, Section 1073, Unlawful Flight to Avoid Prosecution in relation to Guam Police Department Case Nos. 2020-27259 and 2020-25884.

Exhibit A at ¶¶ 3 – 7 (emphasis added).

While the Complaint indicates that the knowledge is gleaned both from Patricio's own personal knowledge as well as from other law enforcement officials, including the Guam Police Department (GPD), as set forth in the Complaint, the information from GPD relates specifically to Moore's departure from Guam in order to avoid prosecution in open GPD cases, in violation of the FFA. Thus, while the federal government may file a complaint under the FFA to arrest a defendant who has fled the state or territory in order to avoid prosecution, this action alone does not establish a joint investigation, even if the allegation is based upon information from local law enforcement.

Courts have emphasized that cooperation between state and federal authorities, such as sharing information or coordinating arrests, does not necessarily rise to the level of a joint investigation for *Brady* or *Giglio* purposes. In *United States v. Ramos-Cartagena*, the court held that a general cooperative agreement between state and federal authorities was insufficient to impose *Brady* obligations on federal prosecutors unless the cooperative activity ***directly resulted*** in the indictment at issue. *U.S. v. Ramos-Cartagena*, 9 F.Supp.2d 88 (D.P.R. 1998). Nothing in Defendant's submissions indicates that the USAO's (and U.S. Marshal Service) filing of the Complaint in the District Court of Guam *directly resulted* in the Indictment in this case. At best, the effort of the USAO and the U.S. Marshals Service resulted in returning the Defendant to Guam to face prosecution, not in the issuance of the Indictment itself, which is subject to local law under

8 G.C.A., Chapter 50. Indeed, the FFA Complaint itself indicates that its purpose is to seek a warrant of arrest pursuant to the FFA. Complaint at ¶ 3, *supra*.

The FFA underscores the independent federal interest in maintaining the integrity of the of the justice system by preventing individuals from evading accountability through jurisdictional loopholes. This principle is consistent with the legislative history of the Act, which highlights its role in addressing a "roving class of criminals" who exploit state boundaries to avoid prosecution. Thus, despite Defendant's contention, the USAO's Complaint against Defendant under the FFA, supported by the Affidavit of Probable Cause signed by Deputy U.S. Marshal Patricio, served a stated federal purpose *independent of the local prosecution*. The USAO directed the prosecution of the FFA Complaint without any involvement of the OAG, and, under the specific facts, it is insufficient to establish a "joint investigation" or "joint prosecution" for the purpose of *Brady* or *Giglio* in this case. The Court notes further that, had the USAO "been acting on the [local] government's behalf in the case," the USAO's Motion to Seal the Case would have barred the OAG from participating in any manner with the federal prosecution – including as an observer to the proceedings – and, therefore, could hardly be deemed a joint prosecution directed by the local law enforcement.

There is no other evidence proffered by the Defendant to indicate that the USAO or the U.S. Marshals Services participated in any way in the investigation of the underlying criminal charges or that their involvement *directly resulted* in the Indictment against Defendant in this case. As such, based upon review of Defendant's submissions evidencing the involvement of the USAO and the US Marshal Service in this case, the Court finds that the USAO's filing of a Complaint in the District Court of Guam advancing an independent federal purpose under the

Fugitive Felon Act does not establish a "joint prosecution" or "joint investigation" for the purpose of invoking the OAG's obligations under *Brady* or *Giglio*.

Moreover, even assuming arguendo that the separate and unrelated complaint under the FFA did constitute a "joint investigation" between the USAO/US Marshals and the local law enforcement – which it clearly does not – the involvement was limited only to the Defendant's departure from Guam to avoid prosecution and did not involve any other investigation of witness Troy Ryan Damian, who is the subject of Defendant's Motion.

## CONCLUSION

For the reasons set forth herein, the Defendant's Motions to Compel *Brady* or *Giglio* material in the possession of the U.S. Attorney's Office, the U.S. Marshal Service, NCIS, the FBI and any other federal agency (collectively, the "Federal Agencies") is **DENIED**. Furthermore, because the Court finds that any material in the hands of the federal government relating to Damian is *not* in the possession of the People, the Court further **DENIES** Defendant's request to extend review of the files of the Federal Agencies as it relates to any of the potential witnesses in this case.

Therefore, the Defendant's requests for relief are addressed accordingly:

1.  Order the Prosecution to "scour" the files of the U.S. Attorney's Office, the U.S. Marshal's Office, and the Naval Criminal Investigation Service (NCIS) for *Brady/Giglio* Material. *Motion* at p. 8 (Aug. 6, 2025): **DENIED**;

2.  Order the Prosecution to report to the Court and Defendant the results of the search, to include identifying the type of files it reviewed, "who participated in the search, what type of information was sought, and what degree of confidence the

government has that its search yielded the correct results and why the government's confidence is at the level reported." *Id.*: **DENIED;**

3.    Order compelled disclosure and, specifically, to "[d]irect the Attorney General's Office to diligently pursue and obtain the material from the U.S. Attorney's Office, with affidavits documenting efforts... ." *Emergency Motion* at p. 5 (Aug. 7, 2025): **DENIED;**

4.    Grant a continuance for an indefinite periof of time; *Id.* at p. 6: **DENIED.**

5.    Impose sanctions or dismissal if non-compliance persists. *Id.*: **DENIED.**

6.    Other relief as appropriate. *Id.*: **DENIED**.

**SO ORDERED** this 20th day of September, 2025.

**HONORABLE MARIA T. CENZON**
Judge, Superior Court of Guam

**SERVICE VIA E-MAIL**
I acknowledge that an electronic copy of the original was e-mailed to:
OAG, PHILLIPS & BUCPATUO, LUJAN & WOLFF, WILLIAMGAVRAS
SEP 2 0 2025  12:11PM
Date    Time
Cynthia T. Tiong
Deputy Clerk, Superior Court of Guam